UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM CLARIDGE, on Behalf of Himself and All Others Similarly Situated, | ) ) ) | CASE NO. 1:23-cv-2240 |
| Plaintiff, | ) ) | JUDGE BRIDGET MEEHAN BRENNAN |
| v. | ) ) ) | **PLAINTIFF'S MOTION FOR PARTIAL** |
| BURNTWOOD TAVERN HOLDINGS, LLC D/B/A BURNTWOOD TAVERN, et al. | ) ) ) | **SUMMARY JUDGMENT** |
| Defendants. | ) ) ) | |

Plaintiff William Claridge and the Opt-In Party Plaintiffs (collectively "Plaintiffs") hereby respectfully request that this Honorable Court grant them partial summary judgment and issue an Order, attached hereto as Exhibit 1, as there are no genuine issues of material fact as to issue of whether Defendants violated the Dual Jobs Regulation, 29 C.F.R. § 531.56(e) and Plaintiffs are entitled to judgment as a matter of law.  A Memorandum in Support is attached hereto.

Respectfully submitted,

/s/ *Lori M. Griffin*
Lori M. Griffin (0085241)
Matthew S. Grimsley (0092942)
Anthony J. Lazzaro (0077962)
The Lazzaro Law Firm, LLC
The Heritage Bldg., Suite 250
34555 Chagrin Boulevard
Moreland Hills, Ohio 44022
Phone: 216-696-5000
Facsimile: 216-696-7005
matthew@lazzarolawfirm.com
anthony@lazzarolawfirm.com
lori@lazzarolawfirm.com

Attorneys for Plaintiffs

## **TABLE OF CONTENTS**

I. SUMMARY OF ARGUMENT ..................................................................1

II. BACKGROUND FACTS .....................................................................1

    A. Procedural Background ..............................................................1

    B. Burntwood Tavern Organizational Structure, Policies and Procedures ...........2

    C. Servers and Bartenders Duties and Side Work Tasks are Similar at All
       Burntwood Locations ...............................................................4

        1. Burntwood Requires Servers and Bartenders Perform Unrelated
           Opening Side Work Duties Prior to the Restaurant Opening
           to Customers While Paying the Tipped Wage Rate. ...................4

        2. Servers and Bartenders Performed Unrelated Running Side
           Work While Earning the Tipped Wage Rate. ...........................7

        3. Burntwood Servers and Bartenders Perform Closing Side
           Work duties which are unrelated to serving after the
           Restaurant is Closed to Customers. ....................................8

III. LAW AND ARGUMENT ...................................................................12

    A. Rule 56 of the Federal Rules of Civil Procedure. ...............................12

    B. Burntwood Must Prove that It Complied With the Tip Credit
       Requirements in Each Week in Order to Avail Itself of the Tip Credit. ..........12

    C. The Minimum Wage for Tipped Employees and the Dual Jobs Regulation. .......13

    D. There are no Material Factual Disputes that Burntwood Required
       Plaintiffs to Perform Maintenance/Janitorial Work that is Unrelated
       to Their Tipped Occupation and Burntwood Failed to Pay Plaintiffs
       the Full Minimum Wage. ...........................................................15

    E. The *Mt. Clemens* Standard Applies to this Case Because Burntwood
       Did Not Track or Monitored the Amount of Time Spent by
       the Plaintiffs Performing Unrelated Work. .......................................17

    IV. CONCLUSION .........................................................................19

# TABLE OF AUTHORITIES

Cases

*Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 66 S. Ct. 1187,
90 L. Ed. 1515 (1946) ..................................................................................17, 18

*Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, (1981) .....................13

*Driver v. AppleIllinois, LLC,* 890 F. Supp. 2d 1008, (N.D. Ill. 2012) ....................18

*Fast v. Applebee's Int'l, Inc.,* 638 F.3d 872, (8th Cir. 2011) ....................................17

*Harding v. Steak N Shake, Inc.,* 745 F. Supp. 3d 571 (N.D. Ohio 2024) .......1, 12, 15, 16

*Harrison v. Rockne's Inc.,* 274 F. Supp. 3d 706, (N.D. Ohio 2017) ....................15, 16

*Helix Energy Solutions Group, Inc. v. Hewitt*, 143 S. Ct. 677, (2023) .....................13

*Justice v. Metropolitan Gov't of Nashville,* 4 F.3d 1387, (6th Cir. 1993) .................12

*Martin v. Tango's Restaurant, Inc.,* 969 F.2d 1319, (1st Cir.1992) .........................13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348,
89 L.Ed.2d 538 (1986) ..............................................................................................12

*Monroe v. FTS USA, LLC*, 860 F.3d 389, (6th Cir. 2017) .......................................18

*Moran v. Al Basit LLC*, 788 F.3d 201, (6th Cir. 2015) ...........................................18

*Myers v. Copper Cellar Corp.*, 192 F.3d 546, (6th Cir. 1999) .................................13

*O'Neal v. Denn-Ohio*, No. 3:19-cv-280, 2020 WL 210801, (N.D. Ohio Jan. 14, 2020) ...........16

*Osman v. Grube, Inc.*, No. Civ. A. 16-CV-802, 2017 WL 2908864,
(N.D. Ohio July 7, 2017) ....................................................................................14, 15

*Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014) .....................12

*Pender v. Flying S. Wings, Inc.,* No. 2:21-CV-04292, 2025 WL 2522943
(S.D. Ohio Sept. 2, 2025) ....................................................................................13, 16

*Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S. Ct. 161, 89 L. Ed. 124 (1944) ....................1

Statutes

29 U.S.C. § 202(a) .......................................................................................................... 13

29 U.S.C. § 203(m) .................................................................................................... 13, 14

29 U.S.C. § 203(t) ........................................................................................................... 14

29 U.S.C. § 206(a)(1)(C) ................................................................................................. 13

R.C. § 4111.01 ................................................................................................................... 1

Rules

Fed.Civ.R. 56(a) .............................................................................................................. 12

Regulations

29 C.F.R. § 516.28(a) ...................................................................................................... 17
29 C.F.R. § 531.56(e) .................................................................................................. 12, 14

Other Authorities

U.S. Dep't of Labor, Wage & Hour Div., Op. Ltr. FLSA–854, 1985 WL 1259240
(Dec. 20, 1985) ............................................................................................................... 15

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### I.    SUMMARY OF THE ARGUMENT

No genuine issues of material fact exist and Plaintiffs are entitled to judgment as a matter of law that Burntwood violated the FLSA's dual jobs regulation by requiring Plaintiffs to perform work unrelated to their tipped occupation while paying less than the full minimum wage.

This Court held in *Harding v. Steak N Shake, Inc.,* 745 F. Supp. 3d 571, 583 (N.D. Ohio 2024), that the 1967 dual jobs regulation is entitled to *Skidmore* deference and has the power to persuade. This Court also held in *Harding* that hosting, taking out trash, sweeping and moping floors, washing dishes, stocking stations, stocking ice, preparing takeout orders, cutting fruit, cleaning the server line, greeting and seating customers, cleaning bathrooms, and ensuring general cleanliness of the restaurant are duties unrelated to serving and any time spent performing those duties must be paid at the full minimum wage. *Id* at 587.

Burntwood's side work charts and the testimony of the Plaintiffs shows that servers and bartenders are required to perform unrelated work similar to that in *Harding* during each shift. Defendants' corporate representative testified that their servers and bartenders are paid the tipped wage rate and testified that Burntwood does not have any policy regarding unrelated work.

### II.    BACKGROUND FACTS

#### A.    Procedural Background

On November 17, 2023, Plaintiff filed this collective action as result of Defendants' violations of the Fair Labor Standards Act's ("FLSA") tip credit and subsequent underpayment of their employees at the federally mandated minimum wage rate and violations of the Ohio Minimum Fair Wage Standards Act ("OMFWSA"), Ohio Revised Code ("R.C.") § 4111.01, *et seq*.

for Defendants' failure to pay Plaintiff and all similarly situated workers their earned minimum wages.  Specifically, Plaintiff alleged that Defendants violated the FLSA and OMFWSA in the following respects:

> a. Violation for performing work unrelated to tipped occupation: Plaintiff was required to perform improper types, and excessive amounts, of non-tipped work, including, but not limited to, cleaning ledges; cleaning the kitchen; cleaning walls and items hanging on the walls; cleaning window blinds, windows and window sills; cleaning the bathrooms; and/or washing trays, appliances, silverware, dishes and/or glasses.
>
> b. Violation for performing non-tipped directly supporting work in excess of 20% of the time spent working in the week and/or in excess of 30 minutes: Plaintiff was required to perform greater than 20% of his time performing non-tip producing direct support work, including, but not limited to, cleaning and stocking the serving line; cleaning booths, chairs, high chairs and booster seats; cleaning menus; cleaning soft drink dispensers and nozzles; cleaning tables; filling and cleaning ketchup and syrup bottles; filling and cleaning salt and pepper shakers; replacing soft drink syrups; rolling silverware; setting tables; stocking ice; sweeping, cleaning and mopping floors; taking dishes and glasses from the tables to the kitchen; and/or taking out trash.  Plaintiff also spent in excess of 30 continuous minutes performing directly supporting work.

(Doc. 1 ¶ 7.)

On May 9, 2024, the Parties stipulated to Court-Supervised Notice for the following class of individuals: All current and former servers and/or bartenders who worked for Burntwood at one or more of its restaurant locations in Ohio for at least one week between March 27, 2021 and the present.  (Doc. 20.)  On August 5, 2024, the Court granted the Parties' stipulation and authorized notice.  (Doc. 23.)

**B.    Burntwood Tavern Organizational Structure, Polices, and Procedures.**

Defendant Burntwood Tavern Holdings LLC d/b/a Burntwood Tavern ("Burntwood") owns and operates Burntwood Tavern restaurants at the following locations: Chagrin Falls, Rocky River, Solon, Brecksville, Cuyahoga Falls, Crocker Park, Lyndhurst, Fairlawn, Belden Village, and North Olmsted.  (Ex. 1, Deposition Transcript of Corporate Representative and Vice President

of Operations Bryan Kelly ("Kelly Depo."), pg. 11.) The Burntwood Tavern locations at Chagrin Falls, Lyndhurst, and Crocker Park have closed during the pendency of this action. (*Id.*) Each Burntwood location is under the umbrella of Burntwood Tavern Holdings, LLC. (*Id.,* pgs. 10-11.) All locations employ servers and bartenders, and pay them the tipped wage (one-half of the Ohio minimum wage). To-Go specialists were also paid the tipped wage rate. (*Id.,* pgs. 12-13, 17.) All the locations operate under similar hours and generally operate two shifts, lunch (opening) and dinner (closing). (*Id.,* pgs. 12-14.)

At all locations, Burntwood schedules at least one server and bartender to come in at least thirty (30) minutes prior to the restaurant opening for the lunch shift in order to perform opening side work. (*Id.*, pgs. 13-14, 32-33; Ex. 2, Claridge Deposition Transcript Excerpts ("Claridge Depo."), pg. 70; Ex. 3, Bucio Deposition Transcript ("Bucio Depo."), pg. 16; Ex. 4, Lisa Gerrity Deposition Transcript ("Gerrity Depo."), pgs. 10-12; Ex. 5, Austin Haig Deposition Transcript ("Haig Depo."), pgs. 17-18; Ex 6, Lynley Baker Deposition Transcript ("Baker Depo."), pgs. 24-25.) Sometimes servers/bartenders came in an hour before the restaurant opened to begin their side work. (Baker Depo., pgs. 24-25; Ex. 7, Taylor Bocciarelli Deposition Transcript ("Bocciarelli Depo."), pgs. 14, 15-16; Ex. 8, Amber Johnson Deposition Transcript, pgs. 11-12.) Servers and bartenders are not earning tips while the restaurant is not open. (Kelly Depo, pg. 34.) Burntwood also assigned at least one server and bartender to "close" each restaurant. (*Id.,* pgs. 32-33.) All servers and bartenders, regardless of which Burntwood location they worked, are subject to the same timekeeping and pay policies and procedures. (*Id.,* pg. 21.) Each Burntwood location also utilizes the same employee handbook and Front of House Approach procedural book. (*Id.*, pgs. 22-23; Bucio Depo, pg. 27.)

### C.    Servers and Bartenders Duties and Side Work Tasks are Similar at all Burntwood Locations.

Each restaurant has designated side work that servers and bartenders are required to complete before the restaurant opens (opening), during their shift (running), and/or after the restaurant closes (closing).  (Kelly Depo., pgs. 42-44, 47; Haig Depo., pgs. 17-18.)  Specific side work duties can be assigned based on the location the server/bartender is working inside the restaurant (bar, expo, side stations) and/or if there are designated opening/closing workers.  (*Id.*) Each location maintains lists/charts of the required side work which are posted in the restaurant. (Kelly Depo, pgs. 55-56; Haig Depo., pg. 9; Baker Depo. pg. 15; Ex. 9, Burntwood Side Work Charts.)

The vast majority of the side work requirements are similar, if not exactly the same at each Burntwood location.   (Kelly Depo. pgs. 56,57, 61, 62-63, 71; Bucio Depo pgs. 17-18, 22; Bocciarelli Depo. pgs. 19-20, 27-28; Ex. 9.)

### 1.    Burntwood Requires Servers and Bartenders Perform Unrelated Opening Side Work Duties Prior to the Restaurant Opening to Customers While Paying the Tipped Wage Rate.

William Claridge, who worked at the Brecksville location from approximately June 2022 to November 2022 testified that he had to cut lemons and wash dishes when he was the opening server.  (Claridge Depo., pgs. 14, 26, 62, 71-72.)  Alexandra Bucio worked as a server at the Fairlawn between March 2022 and May 2022 and at the Solon location, from November 2022 thru July 2023.  (Bucio Depo., pg. 8.)  Regarding her opening duties at Solon, Alexandra Bucio testified as follows:

> A.    So the opening shift would arrive about 10:30 in the morning.  Usually they had one or two servers come in at 10:30.  And we basically set up the whole restaurant.  We had to stock all of the to-gos.  We had to prep the line for expo, for all the run- -- for the food runner.  We had to check every table, make sure it had silverware, it was clean.  We had to check the bar, make sure they were stocked with their plates, forks, everything that they needed.  And also, like, if the patio was

4

open, we also had to make sure that was all cleaned off and swept and ready to go in case we did have people that wanted to sit outside.  (Bucio Depo. pg. 16.)

Lisa Gerrity worked at the Rocky River location as both a bartender and server from approximately September 2018 until April/May 2025.  (Gerrity Depo., pgs. 5-7.)  She testified as follows as related to her opening duties:

> A.   Well, opening servers and opening bartenders do different responsibilities.  So we were scheduled in at 10:30, the restaurant opened at 11:00, and that's primarily. I think there were Sundays where it opened a different time.  So for servers, you would have to set up the pop machines, set up sanitizer buckets, set up the sink -- like the dish tank where you would throw your silverware, set up that part, get linen bags, make sure all the tables are wiped, set, and everything's cleared in the dining room, cut lemons, and then set up the expo line, like anything you would need on that, whether it's brunch or whether it's just a lunch.  And then serving, that's pretty much for opening, but that's not including, like, your side work throughout the day. So that's just to be open. Oh, brew the iced tea, brew the coffee. I think that's good for serving possibly.  And then, for bartending, you come in, uncap all the bottles, get your drafts set up where you pull all the things out of the draft, put the grates down, pull up your garbage can, cut all the fruit, stock your ice.  Oh, and you have to stock your ice as a server, too.  Stock your ice.  Just wipe down the bar top, pull down bar chairs if they were up from the night before for whatever reason.  And I believe that that is pretty much for opening bar.  I'm sure I could be forgetting things also.  (Gerrity Depo. pgs. 10-12.)

Gerrity and Baker also testified that servers and bartenders would have to perform host duties if there was not a host scheduled.  (*Id.,* pgs. 21-22; Baker Depo., pg. 28.)  Gerrity also put away the wine, liquor, and beer orders when they were delivered. (Gerrity Depo., pgs. 21-22.)

Austin Haig worked as a server at the Belden Village location from approximately November/December 2023 until April/May 2024.  (Haig Depo., pg. 11.)  He testified that his opening duties included the following:

> A.   Generally, to set the restaurant up.  There were not very many employees on the clock at all, so a lot of the duties fell upon the server, such as setting up the host station, making sure seating charts were ready for people when they came in, making sure all the tables were clean and set, making sure the side stations for the servers were filled with ice and the pop machines were put back together, making sure pitchers were out for the bartender and yourself, being a server, making sure things in the kitchen were set up, condiments, certain plating aspects, some

5

silverware.  And if there were any dishes or anything like that, it was best to get them out of the way before people arrived.

Q.   What do you mean "get them out of the way"?

A.   Get them washed and ran through the machine.  As well as checking bathrooms and making sure everything was stocked and clean.

(Haig Depo., pgs. 19-20.)

Taylor Bocciarelli was a to-go specialist at Solon from approximately October 2020 through June of 2022 and a server at Cuyahoga Falls between April and May 2025.  (Bocciarelli Depo. pgs. 6-7.)  Bocciarelli was paid the tipped wage rate as a to-go specialist.  (*Id*.)  Bocciarelli testified that the to-go specialist performed the following duties during their shift:

We took all of the to-go orders.  We -- on the phone and on the tablets.  We expedited and bagged all the to-go orders.  We got them out to the front door.  And then we also did our side work, so stocking, our sauces, our date dots on all of our sauces, making sure the bags are stamped, pizza boxes.  And then, at the end of the night we would sweep, take out trash, and reorganize our area as well.  * * * We would help expedite as an ongoing side work. We would help stock as an ongoing side work.  We would be responsible for the ongoing side work of the restaurant, as well as the servers.  And then, at the end of the night, we would take some of their outs, as well, if it had to do with the boxes or the bags, so that they wouldn't have to do that.  And then if a manager told us, "You have to roll silverware during your shift," we had to roll silverware during our shift. (Bocciarelli Depo. pgs. 8-10.)

Bocciarelli stated that as an opening server she was required to "* * *set up on the weekends any VIP events, moving tables, arranging chairs, decorating the party room, setting up linens, cutting fruit, filling the ice, cleaning whatever was left over from the night before.  And then we would also have to roll leftover silverware in the mornings and set up the expo station for the kitchen.  (*Id.*, pgs. 13-14.)

Lynley Baker worked as a server at the Chagrin Falls location between 2021 and May 2023.  (Baker Depo., pg. 10.)  She testified that in addition to washing dishes and silverware (*Id.*, pg. 29), her opening duties included:

In the morning, I would come in, start the coffee machine, put together the iced tea maker, run the iced tea through, get ice for the ice bin, cut fruit, put together the soda pop machine.  I would go -- if it was summertime, I would go out and roll up the umbrellas.  I would sweep or get the leaf blower that they had there and blow off the leaves on the patio.  Wash down the tables, set the tables outside.  Come back in, set up the ketchup for the expo with the ramekins, make sure the to-go sauces were all prepared, because we did a lot of take-out.  Anything else that needed to be done in the kitchen, I would help out.  (*Id.,* pg. 24.)

Amber Johnson worked as a server and bartender at the Fairlawn location from October 2018 thru May 2023.  (Johnson Depo., pgs. 6-7.)  She testified:

Yes.  So I would get there an hour before my shift just to give myself plenty of time to do all of the side work required, and the cleaning tasks required as well. So I would go in, wipe the bar down, cut fruit, which was limes, lemons, oranges, strawberries, et cetera.  We would do alcohol infusions.  I don't know if you're familiar with those.  The vodka and the bourbon infusions.  I was the one who mainly did all of that.  And the cleaning aspect of things, it was -- it was a lot.  Like, I went in to power wash behind the bar.  I shined the copper on the bar top.  Dusting the light fixtures, putting away liquor and wine orders.  Do you want me to go into all of the items that were required? * * * So you would have to cup every station, stock it with lemons, make iced tea, fill ice, roll any silverware that was left over from the night before, do dishes that were left over from the night before, do a lot of stocking and putting away any orders that came in, like to-go boxes, et cetera. (Johnson Depo., pgs. 11-13.)

Additional duties required at opening are identified in Burntwood's side work charts.  (Ex. 9.)  Bar opening duties included : setting  up trash cans; setting up garnish trays; stocking various glassware, liquor, wine, sugar caddies, salt and pepper shakers, and straws, napkins, stirrers, and swords. (Ex. 10, Excerpts from Front of House Approach.)

### 2.    Servers and Bartenders Performed Unrelated Running Side Work While Earning the Tipped Wage Rate.

Burntwood required servers and bartenders to perform unrelated side work during their shift while they are serving customers.  (Kelly Depo., pgs. 35, 43.)  Lisa Gerrity testified that as a server to she had "to stock to-go stuff, fill up all that, stamp the bags, keep filling the ice up, bussed and set her own tables, perform hostess duties, answer the phones which primarily fell onto the

bartender." (Gerrity Depo., pgs. 16-17.)  Austin Haig testified that the running side work or mid-day included:

> " * * * just keep the ice full, keep the drinks full, keep the restrooms clean, keep -- if we ran out of silverware, keep them rolled.  We usually didn't have a dishwasher or a hostess during those times, so they would be washing dishes when they would pile up too much.  They would be seating people. If they came in, there would be online orders such as DoorDash, Grubhub.  They would sometimes be responsible for packaging and making sure those got to the right customer.  Oh, yes, making sure any tables they may have are okay." (Haig Depo., pgs. 35-36.)

Bocciarelli testified that she had take out the trash, run dishes, stamp bags, socking her station stocking the bar, amongst other running side work during her shift.  (Bocciarelli Depo., pgs. 15-16, 19-20.)

If a server or bartender is cut early from the end of their scheduled shift, Burntwood requires them to perform side work before they can leave.  (Kelly Depo., pg. 36.)  Baker testified that at the end of the lunch shift, she would polish and roll silverware, line B&B plates, restock the ketchups and the ramekins for expo, stamp and fold pizza boxes, bags, get take-out containers, restock glassware.  (Baker Depo., pgs. 31-32.)

### 3. Burntwood Servers and Bartenders Perform Closing Side Work duties which are unrelated to serving after the Restaurant is Closed to Customers.

Burntwood required Plaintiffs to perform the following tasks each shift:  wipe down expo, to-go, drink stations; sweep; clean linen shelves; build and stamp pizza boxes and bags; wipe counters and shelves; empty trash; run dishes; burn ice; clean and stock glasses; take out linen bag; wipe down shelving; sweep patio; take down umbrellas; stock various supplies; and various other tasks. (Ex.9.)  Closing duties for the bar included stocking wine, beer, and liquor; stock glasses; wipte down bar/cocktail tables; empty bus tubs and trash cans; and wash all glassware.  (Ex. 10.)

Claridge testified that he polished and rolled silverware at close at the Brecksville location. (Claridge Depo., pg. 80.) Bucio testified that her closing duties at the Fairlawn and Solon locations included but were not limited to the following:

> "check the bathrooms, make sure the booths were clean and wiped down, the bar was wiped down, you know, there was no, like, garbage or anything under the tables.  Lights were turned off.  TVs were turned off. You know, a lot of the times, if there was dishes left over, we had to, like, you know, get back there and wash them, make sure everything was like -- there was nothing left out in the kitchen and everything was prepped for the next day.  You know, we made sure we had everything filled, the sugar caddies, all that stuff."  (Bucio Depo., pgs. 14-18.)

Fairlawn's side work chart also has dishes, taking out trash, burning ice, empty coffee pots and rinse out, break down soda machine, change linen bags as some of the closing side work that is required to be completed by servers.  (Kelly Depo., pgs. 47-49.)  Kelly testified that trash, empty bus tubs, sweep expo floors are duties assigned to servers at the Crocker Park location.  (*Id.* pgs. 51-54.)

Bucio also worked at the Solon location as stated that "It was a little bit more extended work, because when I was working in Solon, we had the patio open.  So that was, you know, double the work.  You had to check everything inside and then go outside and make sure everything was, you know, pristine and clean.  And we weren't allowed to leave -- I wasn't allowed to leave until the manager walked through and made sure everything was good to go." (Bucio Depo., pgs. 17-18.)

Gerrity testified that her closing duties at the bar included:

A.    You have to sweep behind the bar, put up the barstools, sweep around the bar. We're supposed to mop.  Occasionally I mopped behind the bar.  Wipe down all your bottles, wipe down your wells, cover your bottles, clean all the drafts, cap all those, make sure everything is clean and wiped down, do your cash drawer, and -- oh, you wash all the dishes.  So all the bar dishes cleaned.  Put everything away, bring your mats to the back dish.  A lot of times we had to run our own mats because no one was at dish, so I would run my mats.  Lay those out to dry.  And then, yeah, just drain, like, your sink water and make sure everything is wiped and cleaned.  *

* * Oh, and we had to bring our garbage to the back door, and then they would take it from the back door.  (Gerrity Depo., pgs. 13-15.)

Gerrity's closing duties as a server included:

A.   You have to sweep the restaurant.  You have to break down the pop machines, close the expo line, wipe everything down like that, polish, wash.  Normally we would have to wash the silverware if you wanted to roll it.  Polish and roll all the silverware.  There was multiple servers sometimes doing the closing duties.  I really can't attest to how long things like that could take.
Q.   Okay.  That's fair.  And then you --
A.   The servers would also take out the linen bags.
Q.   What do you mean "take out"?
A.    Like, there's a big bag that holds all the linens throughout the day that you use, and they would take them out to the linen thing, or sometimes just leave them by the back door, depending on if there was, like, a dish person or something there.  (Gerrity Depo., pgs. 16-16.)

Austin Haig testified that his closing duties included the following:

A.    Essentially, closing down the restaurant.  Like I said, there were very rarely extra employees as far as hostess and a dishwasher.  So some busier nights you would be lucky enough to have the dishwasher so you didn't have to handle the dishes, but you still had to completely clean up the dining area, all the candles on the tables, blow them out.  If there was any wax, they would want us to rinse those candles out or, like, the candle canisters, refill any of the wicks.  And then just general breaking down side stations, taking away pictures, burning ice, trash, bathrooms, again possibly any sweeping.  In rare instances of a huge mess, a mop or some kind of a floor scrubbing.  And that's -- that's all I can recall at this time.  *** For instance, rolling the silverware, which I forgot to mention before, you can't really finish that job until everybody is gone, every dish is accounted for.  So even if you started, it would just be pointless, so you kind of had to wait until they were all gone.  (Haig Depo., pgs. 24-26.)

Haig went on further to testify that he felt he was not compensated properly:

"So the amount of our shift that was spent not only doing the necessary out work and side work, but the amount of specifically my shifts, which is all I can speak on that I had spent doing side tasks or other projects, just because there was no business, while still being on the clock as a server, such as sweeping every nook and cranny, polishing the wooden chairs, like I had said before, cleaning out dried candle wax of little glass canisters, other projects kind of centered around that.  But the time added up.  (Haig Depo., pgs. 32-33)

Bocciarelli testified that:

"[a]s a closing server, we would have to check out all of the other servers.  We would still have our ongoing side work, so rolling silverware, filling ice, all of those other ones on the list.  And then, after we check out all of the other servers, we would have to put all of the patio umbrellas down, we would have to take the trash out, make sure the expo line was closed, and then also close down our section as well and make sure whatever -- our responsibility was whatever side work didn't get done from the other servers got done.  (Bocciarelli Depo., pg. 16.)

With respect to her closing duties, Baker testified:

Basically it would be the same things: rolling -- polishing, rolling silverware, taking trash out, wiping down tables, resetting the tables, folding pizza boxes, stamping the pizza boxes, stamping bags, filling up to-go sauces, putting away the ketchups that were made during the day.  I would have to refer to the list of duties, of closing duties, to -- you know, taking down the iced tea machine, the coffee machine, stocking glasses, doing the pop, taking the nozzle off, soaking them in soda water, putting away the fruit, clearing out the patio, sweeping the patio, wiping down tables.  (Baker Depo., pg. 35.)

Johnson testified that her closing duties included "taking out the trash, doing all of the glass work, the glassware, cleaning the glassware.  Stocking beer, liquor, wine. Sweeping and mopping behind the bar, wiping down the bar top, counting down our own drawers, and then doing any additional prep that you could to prepare for the next day as well."  (Johnson Depo., pgs. 14-15.)

All of Defendants' locations required Plaintiffs to perform work unrelated to that of a server on a daily basis and also failed to pay them the full minimum wage for that work.  At some point after the commencement of this litigation, Defendants' corporate representative does not know when, servers and bartenders were instructed to clock in at the full minimum wage when opening the restaurant and then to clock out and back in at the server wage rate once the restaurant opened. (Kelly Depo., pg. 17.)  However, this new policy did not extend to the closing or running side work duties and Burntwood Tavern does not maintain a separate timekeeping or pay policy for unrelated work for tipped employees.  (Id. at 80.)

## III.     LAW AND ARGUMENT

### A.     Rule 56 of the Federal Rules of Civil Procedure.

Fed.Civ.R. 56(a) states:

> A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Harding v. Steak N Shake, Inc.,* 745 F. Supp. 3d 571, 581 (N.D. Ohio 2024), quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Id.*, quoting *Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014).

By moving this Honorable Court for summary judgment, Plaintiffs request only that this Honorable Court make a ruling, as a matter of law, as to Defendants liability for violations of the Dual Job Regulation for paying Plaintiffs below the minimum wage for work unrelated to their tipped occupation. There are no genuine issues of material fact as to the fact that Plaintiffs performed non-tipped, unrelated work for Defendants and were paid less than the minimum wage in violation of the dual jobs regulation, 29 C.F.R. § 531.56(e).

### B.     Burntwood Must Prove That It Complied With the Tip Credit Requirements in Each Week in Order to Avail Itself of the Tip Credit.

The employer bears the burden of proving its entitlement to an exception from the FLSA. *See, e.g., Justice v. Metropolitan Gov't of Nashville*, 4 F.3d 1387, 1392 (6th Cir. 1993) ("In relying on the exception, the employer carries the burden of pro[of]."). Indeed, the tip credit is not

automatic and the employer bears the burden to prove its entitlement to the tip credit.  *See,*
*Pender v. Flying S. Wings, Inc.,* No. 2:21-CV-04292, 2025 WL 2522943, at *6 (S.D. Ohio Sept.
2, 2025), citing *Myers v. Copper Cellar Corp.*, 192 F.3d 546, 549 n.4 (6th Cir. 1999).  If the
employer fails to meet its burden of proof, the tip credit may not be claimed, regardless of whether
employees suffered actual economic harm as a result. *See, Martin v. Tango's Restaurant, Inc.,* 969
F.2d 1319, 1323 (1st Cir.1992).

Based upon the evidence cited herein, Burntwood cannot meet its burden as a matter of law
as Plaintiffs performed unrelated duties each shift they worked and were not paid the full minimum
wage as required.  This Honorable Court should grant summary judgment in favor of Plaintiffs.

### C. The Minimum Wage for Tipped Employees and the Dual Jobs Regulation.

Congress enacted the FLSA "to protect all covered workers from substandard wages and
oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the
minimum standard of living necessary for health, efficiency and general well-being of workers.'"
*Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981), quoting 29 U.S.C.
§202(a).  The Supreme Court recently reiterated these points: "Congress enacted the FLSA to
eliminate both 'substandard wages' and 'oppressive working hours.' …The statute addresses the
former concern by guaranteeing a minimum wage." *Helix Energy Solutions Group, Inc. v. Hewitt*,
143 S. Ct. 677, 682 (2023).

Under the FLSA, the minimum wage is $7.25 per hour. 29 U.S.C. § 206(a)(1)(C).  However,
there is an exception to the minimum wage for tipped workers. Section 203(m) of the FLSA
provides that an employer may claim a credit against the obligation to pay $7.25 per hour based
upon the tips the worker receives from customers, if the following conditions are met: (1) the
employer pays an hourly rate of at least $2.13 per hour to the tipped employee; (2) informs the

tipped employee of the requirements of the FLSA; (3) permits the tipped employee to retain all of his/her tips; and (4) ensures that the hourly rate paid by the employer plus the tips received from customers equal at least the minimum wage rate each week. 29 U.S.C. § 203(m). [1] Under the FLSA, "tipped employee" means "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." 29 U.S.C. § 203(t).

In 1967, the DOL issued the "Dual Jobs" Regulation found in 29 C.F.R. § 531.56(e). Section 531.56(e) stated as follows:

> Dual jobs. In some situations an employee is employed in a dual job, as for example, where a maintenance man in a hotel also serves as a waiter. In such a situation the employee, if he customarily and regularly receives at least $30 a month in tips for his work as a waiter, is a tipped employee only with respect to his employment as a waiter. **He is employed in two occupations, and no tip credit can be taken for his hours of employment in his occupation of maintenance man.**

*Id*. (emphasis added).

That means that an employer is only permitted to pay less than the minimum wage when the employee works in a tipped "occupation." *Osman v. Grube, Inc*., No. Civ. A. 16-CV-802, 2017 WL 2908864, at *3 (N.D. Ohio July 7, 2017) ("The regulation does not require an employee to hold two distinct *titles* to be employed in a 'dual job.' Instead, the employee must work in two distinct *capacities*. In other words, the 'dual job' analysis depends on whether the employee's untipped duties are 'related' to the tipped occupation and how often they are performed.") (emphasis in original).

However, where the facts indicate that specific employees are routinely assigned to maintenance-type work or that tipped employees spend a substantial amount of time in performing general preparation work or maintenance, [the DOL] would not approve a tip credit for hours spent

---

[1] The Ohio tipped wage rate is 50% of the regular minimum wage for non-tipped employees.

in such activities.'" *Harrison v. Rockne's Inc.,* 274 F. Supp. 3d 706, 711 (N.D. Ohio 2017), quoting U.S. Dep't of Labor, Wage & Hour Div., Op. Ltr. FLSA–854, 1985 WL 1259240 (Dec. 20, 1985) (finding no tip credit could be given for the 30–40% of time performing "responsibilities [that] extend to the entire restaurant rather than to the specific area or customers which they serve.")."

Plaintiffs were engaged in dual jobs as they frequently performed unrelated work during each shift worked. As shown above, Burntwood's policies and procedures required the Plaintiffs to perform maintenance work akin to janitorial work while being paid the tipped wage rate. There are no genuine issues of material fact that Burntwood violated the dual jobs regulation and Plaintiffs are entitled to judgment as a matter of law.

**D. There are no Material Factual Disputes that Burntwood Required Plaintiffs to Perform Maintenance/Janitorial Work that is Unrelated to Their Tipped Occupation and Burntwood Failed to Pay Plaintiffs the Full Minimum Wage.**

Based on Burntwood's own side work charts and Plaintiffs' testimony, have demonstrated that there are no questions of material fact that they performed tasks unrelated to serving and were not paid the full minimum wage for this time.

"The dual job analysis turns on whether the employee's untipped duties are 'related' to the tipped occupation and how often they are performed." *Harding v. Steak N Shake, Inc.,* 745 F. Supp. 3d 571, 588 (N.D. Ohio 2024), quoting *Harrison,* 274 F.Supp.3d at 710, citing *Osman v. Grube, Inc.,* No. 16-cv-802, 2017 WL 2908864 (N.D. Ohio July 7, 2017). As held in other cases from this District and Division, tasks such as the following are unrelated to serving:

> working the grill line and performing the primary job duties of cook; performing the primary job duties of a host or hostess; taking out trash; scrubbing walls; sweeping and mopping floors; cleaning booths; operating the dishtank and performing the primary job duties of a dishwasher; breaking down and cleaning the server line; ensuring the general cleanliness for the front of the house; detail cleaning throughout the restaurant; stocking stations throughout the restaurant; stocking ice; preparing delivery orders Uber Eats, Grub Hub and Door Dash; preparing takeout orders and online orders from Denny's.com; answering the

15

> phone; working the cash register; greeting and seating customers; preparing salads; preparing deserts, ice creams and milkshakes; cutting lemons, limes, melons and strawberries; washing and stocking unsliced fruits; baking biscuits; preparing specialty drinks such as lemonades, limeades and teas; and rolling bins full of silverware

*Harding,* at 588, citing *O'Neal v. Denn-Ohio*, No. 3:19-cv-280, 2020 WL 210801, at *8-9 (N.D. Ohio Jan. 14, 2020).

Further, the court in *Harrison v. Rockne's Inc.,* 274 F. Supp. 3d 706, 713 (N.D. Ohio 2017) identified the following duties as unrelated to a server's tipped job:  taking out trash, scrubbing walls, sweeping floors, cleaning booths, mopping, washing dishes, breaking down and cleaning the expo line, cleaning and restocking restrooms.

In *Pender v. Flying S. Wings, Inc.,* No. 2:21-CV-04292, 2025 WL 2522943, *14 (S.D. Ohio Sept.  2, 2025), a court in the Southern District of Ohio held that the following duties were unrelated to a server and therefore no tip credit could be taken on time spent performing those duties:

> Here, Plaintiffs have established that during opening shift, Defendants' policies required the tipped employees to clean and sanitize all tables, chairs, and booths including the table and chair legs; sweep the parking lot; pick up cigarette buds around the building; remove trash; clean blinds, door handles, and door glass; and roll out welcome mats. During shift change they were again expected to clean and sanitize all tables, chairs, and booth, ensure dishes were washed and put away, empty trash, and take all trash to the dumpster. Closing duties similarly included substantial cleaning and preparation work, such as restocking soda and server stations, cleaning soda machine and nozzles, washing lemon containers, sweeping, mopping, vacuuming, and removing trash. (internal citation omitted.)

The court found that "[a]s in *Harding*, these tasks were unrelated to tipped work and formed part of a routine, systemic practice rather than isolated or incidental assignments. This supports a finding that the unrelated tasks exceeded 'the occasional request' and was instead part of a 'continuous practice' that occurred each shift."  *Id.*, quoting *Harding,* 745 F.Supp. 3d at 588.)

Burntwood's side work charts show, and several servers and bartenders from different Burntwood locations testified that they performed the following tasks/duties, all of which were held in the District and by this Court to be unrelated to serving and bartending:

| | |
|---|---|
| • Washing dishes, glasses, silverware | • Performing host duties |
| • Taking out trash | • To-go Orders |
| • Sweeping inside | • Cutting lemons and other fruit |
| • Sweeping patio | • Cleaning stations |
| • Cleaning restaurant | • Stocking stations |
| • Cleaning votives | • Stamping bags and pizza boxes |

(See Exs. 1-10.)

These unrelated tasks were/are an every shift occurrence as evidenced by Burntwood's side work charts and thus Plaintiffs are owed the full minimum wage for that time.  There are no genuine issues of material fact that Plaintiffs performed unrelated work and this Honorable Court should grant summary judgment in favor of Plaintiffs on liability.

**E.**  **The *Mt. Clemens* Standard Applies to this Case Because Burntwood Did Not Track or Monitored the Amount of Time Spent by the Plaintiffs Performing Unrelated Work.**

To comply with the FLSA, an employer must keep track of its employees' time spent performing "unrelated" tasks, to ensure proper *compliance* with the minimum wage.  *See, e.g*., 29 C.F.R. § 516.28(a); *Fast v. Applebee's Int'l, Inc.,* 638 F.3d 872, 882 (8th Cir. 2011) ("If [Employer] did not maintain sufficient records from which the employees can differentiate between when they performed tipped duties and when they performed related but non tip-producing duties within the meaning of the dual jobs regulation, then the employees can use the relaxed *Mt. Clemens* standard by produc[ing] sufficient evidence to show the amount and extent of that work as a matter of just

and reasonable inference."); *see also Driver v. AppleIllinois, LLC,* 890 F. Supp. 2d 1008, 1037 n. 13 (N.D. Ill. 2012).

The Sixth Circuit has explained that when an employer fails to maintain accurate records of the time worked by an employee, the employee is entitled to a reduced burden of proof of a mere "just and reasonable inference." *Monroe v. FTS USA, LLC*, 860 F.3d 389, 398-99 (6th Cir. 2017). The Sixth Circuit in *Monroe* stated as follows:

> the Supreme Court's opinion in *Anderson v. Mt. Clemens Pottery Co.*— originally a Sixth Circuit case—explains the burden of proof at trial… The remedial nature of this statute and the great public policy which it embodies ... militate against making that burden an impossible hurdle for the employee." *Id.* at 686–87, 66 S.Ct. 1187. We have since acknowledged that instruction. *See Moran v. Al Basit LLC*, 788 F.3d 201, 205 (6th Cir. 2015).
>
> The Supreme Court also explained how an employee can satisfy his burden to prove both uncompensated work and its amount: "where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes ... an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work **as a matter of just and reasonable inference**." *Mt. Clemens*, 328 U.S. at 687, 66 S.Ct. 1187… Once the employees satisfy their relaxed burden for establishing the extent of uncompensated work, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Mt. Clemens*, 328 U.S. at 687–88, 66 S.Ct. 1187.

*Id.* (emphasis added.)

Here, there can be no reasonable dispute that Defendant's records are inadequate. Indeed, Defendant never tracked the amount of time any of the Plaintiffs spent performing non-tipped work or the production work that they performed. (Kelly Depo., pgs. 26-30, .) Therefore, the Plaintiffs' burden of proof in this case is of a "just and reasonable inference." Defendant has no evidence of the "precise amount" of unrelated work or non-tipped side work that the Plaintiffs

performed each shift. (*Id.,* pgs. 80.) Accordingly, Defendants cannot rebut the Plaintiffs evidence, and the Plaintiffs are entitled to summary judgment on liability.

## IV.    CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that this Honorable Court grant his Motion for Partial Summary Judgment as there are no genuine issues of material fact that Plaintiffs performed work unrelated to their tipped occupation and were paid less than the full minimum wage in violation of the dual jobs regulation, and Plaintiff is entitled to judgment as a matter of law on liability.

Respectfully submitted,

/s/ *Lori M. Griffin*
Lori M. Griffin (0085241)
Matthew S. Grimsley (0092942)
Anthony J. Lazzaro (0077962)
The Lazzaro Law Firm, LLC
The Heritage Bldg., Suite 250
34555 Chagrin Boulevard
Moreland Hills, Ohio 44022
Phone: 216-696-5000
Facsimile: 216-696-7005
matthew@lazzarolawfirm.com
anthony@lazzarolawfirm.com
lori@lazzarolawfirm.com

Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 30, 2025, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access the filing through the Court's system.

<u>  /s/ Lori M. Griffin          </u>
One of the Attorneys for Plaintiffs